UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

IN RE:

LAWRENCE KEITH MILLER,            CASE NO. 05-14726-WSS

    Debtor.                                            Chapter 7

JUDY MORGAN MILLER,

    Plaintiff,

v.                                                  ADV. PROC. NO. 05-01187

LAWRENCE KEITH MILLER,

    Defendant.

**ORDER ON COMPLAINT**

    John Grow, Counsel for the Plaintiff
    Johnny Lane, Counsel for the Defendant/Debtor

This matter came on for hearing on the Plaintiff's request for relief under 11 U.S.C. §523(a)(15) and §727(a)(4). The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2). After due consideration of the pleadings, evidence, testimony, briefs and argument of counsel, the Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

The Plaintiff, Judy Morgan Miller ("Mrs. Miller"), and the Defendant, Lawrence Miller ("the Debtor"), were married for approximately 26 years. Their marriage ended in a mediated

1

divorce settlement, which was integrated into the domestic relations court's order dated February 4, 2000. (Plaintiff's Ex. 2). In paragraph two of the divorce decree, the court awarded the marital home located at 24 Oak Avenue to Mrs. Miller, and the Debtor was to be responsible for paying the first and second mortgages on the property. The Debtor was to hold Mrs. Miller harmless on the two mortgages, and to indemnify her. Harbourton Mortgage Co. held the first mortgage (now held by GMAC). The second mortgage was a line of credit issued by SouthTrust Bank (now Wachovia Bank).[1] The divorce decree also required the Debtor to maintain a $100,000 life insurance policy until the mortgages are paid in full. Mrs. Miller received $1,000 per month for 36 months as rehabilitative alimony in paragraph four of the divorce decree. The Debtor's obligation under the divorce degree cannot be reduced. Mrs. Miller was also awarded another house in the divorce decree, but she lost the home in foreclosure.

Mrs. Miller testified that during the settlement negotiations, she stressed that in exchange for less alimony, she wanted the mortgage payments on her home to be paid by the Debtor, and did not want them subject to change due to remarriage or the death of the Debtor. In exchange, she gave up any interest in Blue Water Marble, a company in which the Debtor was a partner, and agreed to a lower child support payment. She was not able to pay the mortgage on her home without the Debtor's assistance. Mrs. Miller testified that the Debtor told her several times not to worry about the mortgage because he was going to pay it. The Debtor retained all interest in Blue Water Marble, which had an appraised value of $330,000. The Debtor earned about

---

[1] At trial, there was some confusion over the two mortgages referred to in paragraph 2 of the divorce decree. Mrs. Miller thought that a $5,000 lien placed on the property by the City of Satsuma for unpaid sewer service was the second mortgage referred to in paragraph 2. However, the Court found that the two mortgages referred in paragraph 2 of the divorce decree were the Harbourton and the SouthTrust mortgages.

2

Case 05-01187   Doc 28   Filed 07/18/06   Entered 07/18/06 10:59:56   Desc Main
Document      Page 2 of 11

$75,000 per year from Blue Water Marble. The Debtor testified that he was forced out of Blue Water Marble by the other partners in 2002 or 2003. The Debtor testified that he knew Mrs. Miller could not afford to make the mortgage payments on the home.

The Debtor filed the present chapter 7 petition on August 25, 2005. On schedule I, he identified his employer as Marble Works Kitchen and Bath Center ("Marble Works") and listed his net monthly income as $2,213.00. The Debtor's pay statements from Marble Works show that the Debtor earned net income of $36,584 from January 7, 2005 to August 26, 2005. His 2005 federal income tax return listed business expenses of approximately $9,500. Even assuming that the Debtor incurred all of the business expenses pre-petition, these figures show a net income monthly income of $3,385.50. The Debtor also testified that he did not refer to his pay statements before completing schedule I of his bankruptcy petition. He also testified that he earned $21.98 per hour or $879 gross wages per week when he began working at the railroad, or $1,200 net wages every two weeks without overtime.

The Debtor's most recent pay statements from Canadian National Railway Company[2] show that he earned gross wages of $18,340.29 and net wages of $11,987 through March 5, 2006. As a monthly average, these figures show that the Debtor earns $5,802.29. When his expenses of $2,173.00 are deducted from this amount, the Debtor has a net disposable income of $3,622. The Debtor testified that these figures include overtime, which is not always available. From October to December 2005, he received holiday pay while the more senior employees took holiday vacations. His job offered a lot of overtime in January and February 2006 because two co-workers were not working due to sickness and injury. When asked if he had a paycheck that

---

[2]The Debtor left Marble Works to work for the railroad in October 2005.

3

did not include overtime, the Debtor replied that he would not earn overtime for the current pay period at the time of the trial.

The Debtor has remarried and his present wife works and helps with the household expenses, which are as follows:

| | |
|---|---|
| Chase mortgage | 800.00 |
| Chase Equity (2nd mortgage) | 300.00 |
| Nissan | 500.00 |
| Regions VISA | 100.00 |
| Alabama Power | 180.00 |
| Water | 50.00 |
| Mobile Gas | 80.00 |
| Cable/Internet | 100.00 |
| T-Mobile | 130.00 |
| Bell South | 60.00 |
| Child support | 300.00 |
| Tithe | 720.00 |
| Car insurance | 175.00 |
| Health Insurance | 168.00 |
| Medication | 100.00 |
| Gas (for automobile) | 400.00 |
| Groceries | 500.00 |
| College expense for son | 500.00 |
| TOTAL | $5,163.00 |

The Debtor's wife pays half of these expenses, and earns approximately the same income.

The Debtor began having trouble paying the mortgage payments when he left Blue Water Marble in 2002 or 2003. He stopped making the two mortgage payments required under the divorce decree in 2005. He tried to discuss the difficulty with Mrs. Miller, but she would not agree to a reduction in the payment. The Debtor testified that he cannot pay the mortgages required by the divorce decree on his current income. He has borrowed approximately $30,000 from City Finance and his mother to pay the mortgages. Jean Carney, the Debtor's mother, testified that she heard her son agree to pay the mortgages on Mrs. Miller's home. She loaned

4

Case 05-01187    Doc 28    Filed 07/18/06    Entered 07/18/06 10:59:56    Desc Main
Document    Page 4 of 11

him $10,500 to pay on the mortgages. He transferred the title to some property that he owned as security for the loan. The Debtor was supposed to pay back the loan and interest in five years. He does not have enough money to pay his living expenses and the mortgage. Mrs. Miller has recently brought contempt proceedings against the Debtor in domestic relations court for non-payment of the mortgages. The Debtor believes the value of Mrs. Miller's home to be between $160,000 and $170,000. The mortgages on the home equal approximately $90,000.

Mrs. Miller works as a nurse and office manager at a local doctor's office. At the time of the divorce, she earned $200 per week or $1,798 gross pay per month. She now earns $1441 per month. She has the following expenses:

| | |
|---|---|
| Electricity | 300.00 |
| Water & Sewer | 52.00 |
| Telephone | 75.00 |
| Home maintenance | 150.00 |
| Food | 250.00 |
| Clothing | 100.00 |
| Medical & Dental | 50.00 |
| Transportation | 140.00 |
| Charitable Contributions | 125.00 |
| Life Insurance | 30.00 |
| Health Insurance | 30.00 |
| Auto Insurance | 125.00 |
| Property taxes | 83.00 |
| Installment payments | <u>315.00</u> |
| TOTAL | $1,825.00 (Plaintiff's Ex. 16) |

Mrs. Miller has a monthly deficit of $383. Mrs. Miller has remarried. Her husband pays only for the pool maintenance for the home. Since October 2004, Mrs. Miller has been forced to pay the mortgages current two times to avoid foreclosure. She has borrowed approximately $19,0000 from family, friends and her employer to make the payments on the mortgage. Mrs. Miller stated that the Debtor was five months behind on the alimony payments awarded under the divorce

5

Case 05-01187    Doc 28    Filed 07/18/06    Entered 07/18/06 10:59:56    Desc Main
Document    Page 5 of 11

decree. She lost the rental home that she was awarded in the divorce decree to foreclosure because she did not have the alimony payments to pay the mortgage. Mrs. Miller believes that her home is worth $140,000. She owes $79,000 on the GMAC mortgage and $10,000 on the SouthTrust mortgage. The payments for the mortgages are $877.35 and $150.00 respectively.

The Debtor did not list a mortgage to Pensacola Guarantee Mortgage in his bankruptcy schedules. He testified that the home subject to the mortgage is his present wife's home and she financed the purchase of the home. He was required to sign the mortgage as her husband. He did not know if he signed the note to Pensacola Guarantee and there was no evidence that he personally is indebted to Pensacola Guarantee.

The Debtor did not list a 1991 John Deere tractor on schedule B of his bankruptcy petition. He testified that the tractor was not running at the time that he filed his petition, but it is now running. Mrs. Miller presented photographs of the tractor being used to pull a hay wagon. The model is no longer in production and it is in fair condition. After acknowledging owning the tractor at his §341 hearing, the Debtor amended his petition to include the tractor with a value of $1,000.

The Debtor listed a 1998 Ford F150 with approximately 300,000 miles on it with a value of $1,000 on schedule B. He later had the truck appraised in February 2006, and the appraiser placed a value of $3,500 on the truck, although he stated that he would not try to sell the truck on his lot due to its poor condition. Mrs. Miller offered an appraisal that placed the value of the truck between $8,900 and $11,000. The Debtor also listed a 2000 Kawasaki motorcycle with a value of $800. Mrs. Miller had the motorcycle appraised for $4,000 to $5,280. The Debtor testified that the motorcycle was a gift from his wife; it was old and rusty.

6

## CONCLUSIONS OF LAW

The Plaintiff has two causes of action in her complaint: (1) to have the Debtor's obligation to pay the first and second mortgages under the February 4, 2000 divorce decree declared a nondischargeable debt under 11 U.S.C. §523(a)(15); and (2) to have the Debtor's discharge denied for making a false oath under 11 U.S.C. §727(a)(4). Because the §523(a)(15) claim will be moot if the Debtor's discharge is denied, the Court will first address the §727 claim.

Section 727(a)(4) provides:

a) The court shall grant the debtor a discharge, unless— . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case–

    (A) made a false oath or account;
    (B) presented or used a false claim;
    (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
    (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

To prove a claim under §727(a)(4), the objecting party must prove: (1) that debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the statement was made with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *In re Matus*, 303 B.R. 660, 676 (Bankr. N.D. Ga. 2004) (citations omitted). To be "material", the false oath "must bear a relationship to the bankrupt's business transactions

7

or estate, or concern the discovery of assets, business dealings or the existence and disposition of his property." *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984). A deliberate omission from bankruptcy schedules or the statement of financial affairs may be considered a false oath under 11 U.S.C. §727(a)(4). *Id.* The objecting party has the initial burden of proof. Federal Rules of Bankruptcy Procedure 4005. The debtor has the ultimate burden to provide a satisfactory explanation of the omission for the court. *Chalik*, 748 F.2d at 619.

The fraudulent intent element must be proven by actual, not constructive fraud. *In re Eigsti*, 323 B.R. 778, 784 (Bankr. M.D. Fla. 2005). In the absence of direct evidence, actual fraud may be proven by a pattern of concealment or a reckless disregard for the truth. *In re Unger*, 333 B.R. 461, 468 (Bankr. M.D. Fla. 2005).

According to Mrs. Miller's amended complaint, the Debtor omitted a tractor from his list of personal property, undervalued his truck and motorcycle, and understated his wages, all with the intent to deceive his creditors. While any one of these incidents of omission or under valuation may be seen as inadvertent, together the four events lead to a different conclusion. "[M]ultiple inaccuracies in a debtor's petition and bankruptcy schedules taken cumulatively evidences a 'cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by §727(a)(4)(A).'" *In re Leffingwell*, 279 B.R. 328, 351 (Bankr. M.D. Fla. 2002) quoting *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 484 (E.D. Va. 1997).

The Debtor explained that he did not list the tractor because it was not running at the time that he filed his bankruptcy petition. However, Mrs. Miller produced a picture of the tractor pulling hay wagon, and the Debtor acknowledged that the tractor is now operable. The Debtor's explanation that he thought the tractor to be worthless does not excuse the exclusion. In his

8

amended schedules, the Debtor acknowledged that the tractor's parts could be salvaged for at least $1,000. The Court has no conclusive evidence on the value of the tractor, but the photograph of the tractor in use causes the Court to question the Debtor's valuation. The tractor appears to be in fair condition and may be worth more than the Debtor's consistently low valuations for his other property. It is not for the debtor to determine whether an asset is worthless and without value. "Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984), citing *Morris Plan Industrial Bank v. Finn*, 149 F.2d 591, 592 (2nd Cir. 1945). "'Debtors cannot escape disclosure under [§727(a)(4)] by claiming that assets omitted are worthless; it is up to the creditors to decide for themselves what assets will be of benefit to them and which will not.'" *Unger*, 333 B.R. at 469 quoting *In re Ingersoll*, 124 B.R. 116, 122 (M.D. Fla. 1991).

Mrs. Miller also asserts that the Debtor undervalued two other assets. In his original petition, the Debtor listed the value of his 1998 Ford truck with 300,000 mileage at $1,000. When challenged by the adversary proceeding, he had the truck appraised. The appraiser gave a value of approximately $3,500, but stated that he would not allow the truck to be sold from his dealership due to its poor condition. The Debtor produced photographs of the truck showing torn upholstery. Mrs. Miller submitted an appraisal for $8,900 to $11,000 for the truck. However, it is difficult to believe that a eight year truck with 300,000 miles on it could command a price of $8,900. The Debtor's own appraisal shows a value of $3,500, which the Court finds is the value of the truck. The Debtor listed his 2000 Kawasaki motorcycle with a value of $800, and Mrs. Miller produced an appraisal of the motorcycle for $4,000 to $5,280. At trial, the Debtor said that the motorcycle was a gift from his wife, and it was in poor condition, so he did not think it

9

was worth much. It is significant that the Debtor only took the time to have the items appraised after the discrepancies were brought to his attention. The Debtor points out that he amended his schedules to correct the values of these assets. However, he did not bother to amend his schedules to change the value assigned to his truck. Depending on the circumstances, "subsequent amendments to a debtor's schedules may or may not cure an earlier omission, . . ." *In re Green*, 268 B.R. 628, 648 (Bankr. M.D. Fla. 2001) (citations omitted).

The Court must also consider the amount listed for the Debtor's wages in schedule I. The Debtor listed his net monthly wages as $2,213. The information from the Debtor's pay statements submitted by Mrs. Miller show net monthly income of $3,385.50, a difference of about $1,200. The Debtor testified that he did not refer to his pay statements when he completed his bankruptcy schedules. Again, the Debtor failed to take the time to give correct information for a matter as crucial his income when filling out his bankruptcy schedules.

The Debtor's inattention to providing accurate information cost his creditors the opportunity to fairly assess his financial situation, and indicates a reckless disregard for the truth. The Debtor never took the time to include all of his property in his schedules, and give fair estimates of value for some of his assets. As stated above, any one of these inaccuracies may not be cause for disallowing the Debtor's discharge, but together they show a pattern of behavior bent on misleading the Court and his creditors about the value of his property. At the very least, the Debtor's conduct shows a cavalier and reckless disregard for the truth. This factor along with the pattern of misinformation in the Debtor's original schedules leads the Court to the conclusion that the Debtor made a false oath when he filed his bankruptcy schedules without listing the tractor, undervaluing his truck and motorcycle, and understating his wages. Therefore, the Court

10

Case 05-01187    Doc 28    Filed 07/18/06    Entered 07/18/06 10:59:56    Desc Main
Document      Page 10 of 11

finds that the Debtor's discharge should be denied. Since the Debtor will not receive his discharge, his debt to Mrs. Miller will not be discharged; therefore, the Court will not reach the issue of whether the debt to Mrs. Miller is dischargeable under 11 U.S.C. §523(a)(15).

Based on the foregoing, it is hereby

**ORDERED** that the discharge of Lawrence Keith Miller is **DENIED** pursuant to 11 U.S.C. § 727 (a)(4).

Dated: July 18, 2006

*William S. Shulman*
WILLIAM S. SHULMAN
CHIEF U.S. BANKRUPTCY JUDGE